**Craig L. STINGLEY, Plaintiff–Appellant,**

v.

**PRODUCTION SPECIALTIES GROUP, Defendant–Appellee.**

**No. 01–1644.**

United States Court of Appeals, Seventh Circuit.

Submitted Dec. 18, 2001.*

Decided Dec. 19, 2001.

Before POSNER, MANION, and ROVNER, Circuit Judges.

## ORDER

After being discharged from his job at Production Specialties Group ("PSG"), Craig L. Stingley sued his former employer for racial discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e. The district court concluded that Stingley was unable to set forth a prima facie case of discrimination and granted summary judgment to PSG. Stingley appeals, and we affirm.

PSG is a Wisconsin engineering firm that designs and produces machines according to their customers' special needs. From 1995 to 1998 Stingley was the only African American working at PSG. On three occasions in 1996 and 1997, Stingley's supervisor, Keith Hietpas, made patently offensive, racist remarks. The first two of these remarks ("I heard all black people like watermelon" and "I thought all black people liked to dance") were made directly to Stingley, and Stingley overheard Hietpas make the third comment ("He's acting just like a nigger") during a conversation with other employees in reference to a black man who was being interviewed on television. Stingley did not

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R.App. P. 34(a)(2).

report these remarks to either of the company presidents.

PSG originally hired Stingley as a "design detailer," but a year and a half after he began working there Stingley was put in charge of "documentation coordination." The parties disagree as to the reason for the job change. Stingley maintains that he was replaced as design detailer by two white employees because Hietpas was racist. PSG claims that Hietpas, acting with the company presidents' approval, moved Stingley into the "documentation coordinator" position in order to improve Stingley's design skills by exposing him to completed designs and technical manuals. PSG also claims that the two white employees were assigned design detailing work only temporarily to accommodate an unexpected upswing in business.

The events precipitating Stingley's termination occurred in the spring and summer of 1998. The company president wanted Stingley to work on a relatively small job for a nearby factory. The job involved designing a machine that would essentially move an electronic component from one end of a room and load it into a "deburring bowl" at the other; Stingley was to "detail" the plans for the machine, which involved choosing materials and making drawings according to exact measurements. After PSG designed, built, and installed the machine, however, the client discovered that the machine dropped the electronic component two and one-half inches short of the "deburring bowl." PSG's president traced the problem back to Stingley's reliance on inaccurate measurements supplied by the customer. Moreover, the president discovered that Stingley had not made changes in materials to account for an alteration that Hietpas had made to the plans; this failure to adapt the design to Hietpas's change resulted in the machine's premature degeneration. It is unclear from the record who ultimately decided to fire Stingley, but after these discoveries Hietpas called Stingley to his office and terminated his employment with PSG, citing Stingley's "exceptional poor quality" of work on the failed project. A letter in the record confirms that Hietpas actually fired Stingley, yet PSG's president claims in an affidavit to have personally decided to fire Stingley and to have ordered Hietpas to communicate that decision to Stingley.

Stingley then brought this suit under Title VII, alleging discriminatory treatment based on race. In granting summary judgment for PSG, the district court found that Stingley presented no direct evidence that race played a role in the decision to fire him. The court then considered whether Stingley had made out a prima facie case under the familiar burden-shifting approach enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court found that Stingley could satisfy two prongs of the prima facie test by showing that he belonged to a protected class and that he had suffered an adverse employment decision. But, the court went on to note, Stingley had produced "little more than a scintilla" of evidence that he was meeting his employer's legitimate expectations and no evidence that other, similarly situated employees were treated more favorably. Although that analysis should have been sufficient to dispose of the case, *see Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997), the court nonetheless proceeded to consider whether Stingley could prove that PSG's stated reason for his termination–the "exceptional poor quality" of his work on the failed project–was pretext. After reviewing Stingley's version of events, the court ruled that Stingley had presented no evidence that PSG's stated reason was pretext masking discriminatory motive.

On appeal Stingley asserts with minimal elaboration that the district court was simply wrong to grant summary judgment to the defendants. But he has given us no legal reason to disturb the district court's ruling, and he has not directed us to any disputed facts that would preclude summary judgment. As the district court found, Stingley cannot make out a prima facie case of race discrimination because he cannot point to a similarly situated employee who was treated more favorably than he was. Stingley's failure to establish this prong of the prima facie case dooms his case. *See Morrow v. Wal–Mart Stores, Inc.*, 152 F.3d 559, 562–64 (7th Cir.1998). Therefore, we AFFIRM the judgment of the district court substantially for the reasons stated in its memorandum and order dated February 9, 2001.